J-S12032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2339 EDA 2020 |

Appeal from the Decree Entered December 10, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000074-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2340 EDA 2020 |

Appeal from the Order Entered December 10, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001772-2018

BEFORE:  LAZARUS, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED AUGUST 2, 2021**

T.A. ("Father") appeals from the Decree granting the Petition filed by the Philadelphia Department of Human Services (hereinafter, "DHS" or the "Agency") seeking to involuntarily terminate his parental rights to his dependent child, R.L.T. ("Child") (a female born in May 2017), pursuant to the

Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] Father also appeals from the Order changing Child's permanency placement goal to adoption, pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2] We affirm.

DHS became involved with the family in September 2017 due to concerns for the safety and welfare of Child. DHS had received a report that Mother was unable to care for Child. The report was determined to be valid and in August 2018, legal custody of Child was transferred to DHS and physical custody of Child was transferred to a maternal cousin, L.K. L.K. also has custody of Child's sibling, E. Father's location was unknown. In August 2018, the court ordered a Parent Locator Search for Father and appointed Claire Leotta, Esquire ("Attorney Leotta"), as Father's counsel.[3] Shelter Care Order – Amended, 8/1/18, at 2. Numerous meetings and hearings relating to Child

_____

[1] In a separate Decree entered on October 1, 2020, the trial court voluntarily terminated the parental rights of Child's mother, R.T., ("Mother"), to Child, confirming her consent to Child's adoption. Mother has not filed a brief in Father's appeal, nor has she filed an appeal from the Decree terminating her parental rights or the Order changing Child's permanent placement goal.

[2] On January 6, 2020, this Court, *sua sponte*, consolidated Father's appeals. Father properly filed a Notice of Appeal at each docket number.

[3] Numerous additional attempts were made to locate Father. At a September 2018 Adjudicatory hearing, The Community Umbrella Agency ("CUA") was ordered to make outreach to Father. Order of Adjudication, 9/26/18, at 2. Following a permanency review hearing in March 2019, the court ordered DHS to conduct another Parent Locator Search for Father. Permanency Review Order, 3/6/19, at 2. In June 2019, the court ordered the Assistant City Solicitor to conduct an updated Parent Locator Search as to Father. Permanency Review Order, 6/5/19, at 2.

were held between 2017 and 2020, including single case plan meetings, status meetings, an adjudicatory hearing, a shelter care hearing, and multiple permanency review hearings. Father was not present at any of the meetings or hearings, and his whereabouts remained unknown until January 2020, when he attended a permanency review hearing. Permanency Review Order, 5/22/20, at 2. At that hearing, Father requested, and was referred for, a paternity test. *Id.* A permanency review hearing was held in May 2020, at which Mother signed Voluntary Relinquishments to Child, and Father was determined to be Child's biological father by paternity test. *Id.* Father did not attend the hearing, and CUA again was ordered to make outreach to Father. *Id.*

On October 1, 2020, the trial court held a hearing, after which it issued a Decree of Termination of Parental Rights – Confirm Consent for Mother. Trial Court Opinion, 1/12/21, at 14. The trial court ordered Father to comply with a home evaluation, provide proof of income, and have supervised visits at the Agency. Permanency Review Order, 10/1/20, at 2. A termination hearing was scheduled for Father alone on December 10, 2020.

On December 10, 2020, the trial court held a hearing on DHS's Petitions for the involuntary termination of Father's parental rights and a goal change. Kristina Helmers, Esquire ("Attorney Helmers"), represented DHS. Attorney Leotta represented Father, who participated via teleconference. Craig Lord, Esquire, represented Child, who was three-and-a-half years old, as guardian *ad litem*/legal interest counsel.

DHS first presented the testimony of Tyesha Grasty ("Grasty"), the CUA case worker assigned to the case. Father then testified on his own behalf. The trial court made the following findings of fact based on the testimonial and documentary evidence.

> At the termination hearing on December 10, 2020, this [c]ourt heard credible, persuasive evidence from [] Grasty, … who stated she was assigned to the case on March 11, 2020. She noted [that] Child came into care because of [] Mother's mental health issues, and her lack of adequate supervision. She noted that Father was not involved in [] Child's care, and at the time when the first single case plan was created, Father's whereabouts were unknown. Father made himself available to DHS on [January 20, 2020], when he appeared at a hearing and requested a paternity test.
>
> [] Grasty testified she made various attempts to engage Father a couple of weeks after the case was assigned to her by sending certified mail to [Father's] address []. She did not receive a response from Father after the mailing. She testified [that] the first time she made contact with Father was at the court hearing on [October 1, 2020], and [Father] said he knew he was the biological father as a result of the paternity test. [] Grasty testified that between the time she was assigned the case in March 2020[,] and the court hearing on [October 1, 2020], Father did not at any point reach out to her asking to see [C]hild. After she made contact with Father, single case plan objectives were listed for him: to have supervised visitation at the Agency; for him to complete a home investigation; for him to provide proof on [*sic*] employment or S[ocial] S[ecurity] I[ncome][("SSI")]; and for him to maintain contact with [Grasty] and DHS.
>
> [] Grasty testified she made a visit to the home … and she determined the home was appropriate. Father stated this address was his mother's home and he had no ownership or lease of the property. [Grasty] stated she had concerns about whether Father actually had stable housing and lived at the address. Regarding his income, she testified [that] Father provided a letter stating [that] he was in the process of obtaining SSI but was not receiving assistance at the present time[,] and noted Father was currently

unemployed. [] Grasty stated she had concerns about Father's stability, his housing and how he supports himself, and his ability to care for [] Child. She noted [that] Father has not at any time made himself available to attend any of [] Child's medical appointments.

Regarding visitation, [] Grasty testified Father was offered 11 supervised visits with [] Child. He missed 2 visits, [and] attended 9 visits. [Grasty] testified she was able to observe the visits. She noted [] Child does not know [Father,] as her [f]ather and has had no contact with her in the two years she has been in care. [Grasty] believes there is no parent-child relationship between the two and there is no parental bond. [Child] sees [Father] only at the supervised visits and does not know him. [Grasty] noted that Father has other children who are in the care of their mothers and he is not involved in their care.

[] Grasty testified [that] Child lives with her pre-adoptive foster parent, [L.K.] She has observed the relationship between [] Child and [L.K.;] they are bonded and have a parent-child relationship. [] Child looks to [L.K.] for love, support and protection. [] Grasty opined that [] Child would not suffer irreparable harm if Father's parental rights were terminated because they do not have a parental bond and [] Child does not know him. Further, she opined it would be in [] Child's best interest to be freed for adoption by [L.K.]

On cross-examination by [Attorney] Leotta, … Grasty testified she was unaware that Father was incarcerated [in 2016]. She noted that after her first contact with Father in October 2020, and that [*sic*] he was able to begin and attend parenting class[es]. [] Grasty testified that[,] during her supervision of the case, she sent Father 3 or 4 certified letters to [Father's] address and did not receive a response.

Trial Court Opinion, 1/12/21, at 17-20 (citations omitted).

Next, the trial court set forth its findings of fact from Father's testimony.

Father was the next witness to testify. He stated he was at home in August [] 2018 when [] Child came into care and he did not receive certified letters at his address. He stated he received a [N]otice to appear at a court hearing when the case first opened in 2018, but he did request a paternity test in 2019. He testified

he was incarcerated and released in 2016, and he has not been incarcerated since that period. He stated he began parenting classes in October 2020 and believes he has attended 2 sessions. He attended visits with [] Child and wants to continue the visits. He further testified he received the results of the paternity tests in August 2020.

On cross-examination by [Attorney] Helmers, … Father stated he was aware in August 2020 that he was the [f]ather and was unaware [that] Child was in care in 2018.

This [c]ourt found that Father's testimony was not credible. Father first claimed he did not know [] Child was his until he received the results of the paternity tests[;] however, he did know [that Mother] claimed he was the [f]ather in 2018 and received court [N]otices to appear and appeared at [] certain hearings[,] but does not recall what the hearings were for. His response to questioning was being coached by his girlfriend, who was on the virtual call and admitted she was refreshing his recollection as to dates and his actions.

Trial Court Opinion, 1/12/21, at 20 (citations omitted).

On December 10, 2020, the trial court entered the Decree involuntarily terminating Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and the Order changing Child's permanency placement goal to adoption, pursuant to 42 Pa.C.S.A. § 6351.

On December 15, 2020, Father timely filed Notices of Appeal, along with Concise Statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises four issues, as follows:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father,] and changing [Child's] goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(1)[,] where

- 6 -

Father presented evidence that he made significant efforts to perform his parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father,] and changing [Child's] goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(2)[,] where Father presented evidence that he made significant efforts to remedy any incapacity or neglect[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father,] and changing [Child's] goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) and (a)(8)[,] where the evidence clearly showed that [Child] was removed from Mother's care at birth and [Father's] whereabouts were not known at that time[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Father,] and changing [Child's] goal to adoption pursuant to 23 Pa.C.S.A. [§] 2511(b)[,] where evidence was presented that Father has a positive parental bond with [Child] that would be detrimental to sever[?]

Father's Brief at 8.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [] 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion

only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [] 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384

(Pa. Super. 2004) (*en banc*). We will address sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect, or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-

being; and (3) the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied. ***See In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

Regarding section 2511(a)(2), Father argues that the testimonial evidence admitted at the hearing showed that he has remedied the conditions that caused Child to come into care. Father's Brief at 21. Father asserts that he has complied with the goals set for him, and he continued to maintain contact with Child after his release from prison. ***Id.*** at 21.

The trial court addressed Father's issue regarding 23 Pa.C.S.A. § 2511(a)(2) as follows:

> This [c]ourt found Father is incapable of providing safety and permanency for [] Child now and in the future. Father failed to act on any opportunity to get to know [Child] and failed to take any meaningful steps to be involved in her life. The conditions which necessitated their placement exist today. The evidence leaves no doubt that Father cannot and will not remedy the conditions which brought [] Child into supervision. Here, the totality of the evidence supports this [c]ourt's conclusion that termination of Father's parental rights is in the best interests of this Child.

Trial Court Opinion, 1/12/21, at 17, 20-21.

The trial court found that Grasty credibly testified that she first made contact with Father at the court hearing on October 1, 2020. Trial Court

- 10 -

Opinion, 2/15/19, at 19; N.T., 12/10/20, at 11. Grasty testified that between the time she was assigned the case in March 2020, and the court hearing on October 1, 2020, Father did not ask to see Child. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 12.

Father had Single Case Plan objectives, including participating in supervised visitation with Child at the Agency, completing a home investigation, providing proof of employment or SSI, and maintaining contact with her and DHS. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 12. Although Father had appropriate housing, Grasty was concerned that he was residing in his mother's home, which he did not own. Trial Court Opinion, 2/15/19, at 18; N.T., 12/10/20, at 13. Grasty was not certain that Father even lived at the home or could provide Child with stable housing. Trial Court Opinion, 2/15/19, at 18; N.T., 12/10/20, at 13. Additionally, although Father provided Grasty with a letter stating that he was in the process of obtaining SSI, he was not receiving SSI assistance and was unemployed. Trial Court Opinion, 2/15/19, at 18; N.T., 12/10/20, at 13-14. Thus, Grasty was concerned about Father's stability, his housing, his own support, and his ability to care for Child. Trial Court Opinion, 2/15/19, at 18; N.T., 12/10/20, at 14.

Moreover, Father had not attended any of Child's medical appointments. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 18. Grasty testified that Father was offered eleven supervised visits with Child, of which he

attended nine and missed two. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 14.

The trial court's determination that DHS satisfied the requirements of section 2511(a)(2) is supported by competent, clear, and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Thus, we cannot grant Father relief on this claim.

Regarding section 2511(b), Father argues that the trial court abused its discretion when it terminated his parental rights. Father's Brief at 24. Father asserts that the extent of the bond depends on the circumstances of the case, and that the party seeking termination must produce evidence concerning the effect that termination would have on Child. *Id.* Father argues that a needs and welfare analysis requires consideration of the developmental and emotional needs of Child. *Id.*

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination

- 12 -

of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d at 267.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

The trial court addressed Father's issue regarding 23 Pa.C.S.A. § 2511(b) as follows:

> After this [c]ourt found the statutory requirements for involuntary termination of parental rights had been met pursuant to 23 Pa.C.S.A. § 2511(a), this [c]ourt then determined pursuant to 23 Pa.C.S.A. § 2511(b) whether severing the parent-child relationship is in [] Child's best interest, giving primary consideration to the needs and welfare of [] Child. In making this

- 14 -

determination, this [c]ourt carefully examined both the tangible and intangible dimension of the needs and welfare of [] Child. The tangible dimensions of [] Child's needs involve providing for the physical necessities of life including shelter, food, clothing and medical care. The intangible dimension of the parent-child relationship involves consideration of the love, closeness, comfort and security shared, the emotional bond that may or may not exist between the parent and [] Child and the likely effect termination of parental rights will have on them.

In this case, this [c]ourt had adequate evidence of the status of the parent-child bond to examine and determine whether terminating Father's parental rights would destroy a necessary and beneficial relationship.

This [c]ourt heard credible, persuasive testimony from [] Grasty, who testified she had personally observed interactions between [] Child and Father[,] and there is no parental bond. [] Child has a parental bond with her pre-adoptive foster mother, L.K., and looks to her for love, support and care. She further opined [] Child would not suffer any irreparable harm if Father's parental rights were terminated[,] and it would be in [] Child's best interest to be adopted.

Trial Court Opinion, 1/12/21, at 21-22.

The trial court found that the following testimony of Grasty was credible. When Grasty observed the visits, she noted that Child does not know Father as her father, and Child has had no contact with Father in the two years she has been in care. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 15. Grasty believes there is no parent-child relationship between Child and Father, and there is no parental bond. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 16. Child sees Father only at the supervised visits and does not know him. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 16. Grasty noted that Father has other children who are in the care of their mothers, and

he is not involved in their care. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 15.

Grasty testified Child lives with her pre-adoptive foster parent, L.K. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 17-18. She has observed the relationship between Child and L.K., and testified they are bonded and have a parent-child relationship. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 18. Child looks to L.K. for love, support, and protection. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 18. Grasty opined that Child would not suffer irreparable harm if Father's parental rights were terminated because they do not have a parental bond and Child does not know him. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 19. Further, she opined it would be in Child's best interest to be freed for adoption by L.K. Trial Court Opinion, 2/15/19, at 19; N.T., 12/10/20, at 19.

The trial court's determination that DHS satisfied the requirements of section 2511(b) is supported by competent evidence in the record. **S.P.**, 47 A.3d at 826-27; **T.S.M.**, 71 A.3d at 267. There was sufficient evidence in the record from which the trial court, considering Child's needs and welfare, could have properly found that there was no bond between Child and Father, and that the termination of Father's parental rights was in Child's best interest.

Next, we address Father's final claim, in which he asserts that the trial court erred in concluding that DHS proved, by clear and convincing evidence,

that Child's permanency placement goal should be changed to adoption.[4]

Father's Brief at 23-24.

We address this issue mindful of the following:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d at 1190 .

Moreover,

[i]t is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In the Interest of D.P.*, 972 A.2d 1221, 1225 (Pa. Super. 2009) (quoting *In re C.M.*, 882 A.2d 507, 513 (Pa. Super. 2005)).

Further, we have instructed that,

[p]ursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and

_____

[4] In his Concise Statement and the Statement of Questions Involved portion of his brief, Father raises the goal change, and Father discusses the goal change Order in the argument portion of his brief, supporting the discussion with citation to 42 Pa.C.S.A. § 6351. Thus, we find that Father preserved the challenge to the goal change Order.

feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted); *see also* 42 Pa.C.S.A. § 6351.

As this Court has stated,

a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.D.H.*, 171 A.3d 903, 910 (Pa. Super. 2017) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006)).

In its Opinion, regarding the goal change Order, the trial court stated as follows:

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g)[.]

Once reunification is ruled out, the second preferred permanency option is adoption. Adoption has been clearly established as the appropriate goal in the best interest of [Child]. This [c]ourt heard credible, persuasive testimony that this 3½

- 18 -

years[*sic*][-]old[-][c]hild is bonded to [L.K.] and that it would be in her best interest to be adopted.

This [c]ourt finds the record sustains the factual findings and legal conclusions regarding [] Child's current placement, Father's lack of compliance, and lack of willingness to be a responsible parent for this Child. Most importantly, the record demonstrates both that reunification is not feasible, and that sufficient competent evidence exists to change the permanency goals from reunification to adoption.

Trial Court Opinion, 1/12/21, at 22-23.

After a careful review, we conclude that the record supports the trial court's determination. The record demonstrates that Father was not able to provide appropriate parental care or control for Child at the time of the goal change Order, and that it would be in Child's best interest to be adopted by L.K. Thus, we discern no abuse of discretion or error by the trial court in concluding that Child's life should not remain on hold indefinitely and that a goal change to adoption would be in her best interest. *In re A.B.*, 19 A.3d at 1088-89.

Accordingly, as we conclude that the trial court did not commit an error of law or an abuse of discretion in terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), and (b), we affirm the termination Decree, as well as the Order changing Child's permanent placement goal to adoption.

Decree and Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2021